UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

                                                    Case No. 16-cr-20460

                                                   HON. MARK A. GOLDSMITH

EDWIN MILLS, et al.,

    Defendants.
_____/

**OPINION & ORDER
DENYING DEFENDANT DONELL THOMPSON'S MOTION IN LIMINE TO ALLOW
EXPERT WITNESS TESTIMONY REGARDING EYEWITNESS IDENTIFICATION
(Dkt. 542)**

This matter is before the Court on Defendant Donell Thompson's motion in limine to allow expert testimony on eyewitness identification or, in the alternative, to conduct a Daubert evidentiary hearing (Dkt. 542). The Government has filed a response in opposition to motion (Dkt. 584), to which Thompson replied (Dkt. 615).[1] For the reasons discussed below, the Court denies the motion.

**I. BACKGROUND**

A federal grand jury returned a second superseding indictment on February 28, 2018, charging the eleven defendants in this case with various crimes, including violations of the Racketeering Influenced and Corrupt Organizations Act (the "RICO" Act), 18 U.S.C. § 1961 et seq. See generally 2d Superseding Indictment (Dkt. 292). That indictment claims that Defendants were members and associates of a criminal enterprise—the "6 Mile Chedda Grove" street gang in

---

[1] Because oral argument will not aid the decisional process, these motions will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2).

Detroit—one of whose purposes was to "preserv[e] and protect[] the power, territory, reputation, and profits of the enterprise through murder, robberies, intimidation, violence, and threats of violence." Id. at 2, 6. The indictment further alleges that the enterprise's profits derived primarily from the sale and distribution of controlled substances, including crack cocaine, heroin, and morphine. Id. at 5. The sale and distribution alleged was not limited to Michigan; gang members and associates purportedly sold and distributed controlled substances in Ohio, Kentucky, Tennessee, Alabama, and West Virginia. Id.

Five of the eleven defendants have since pleaded guilty.[2] The six remaining defendants have been separated into two groups with separate trial dates. See 8/7/2018 Order (Dkt. 425). Group One, composed of four defendants who are not subject to the death penalty upon conviction, has a trial date of April 23, 2019. See Group One Scheduling Order (Dkt. 464); 9/21/2018 Status Conference (finalizing Group One trial date). Group Two, composed of two defendants who are death-penalty eligible, has a trial date of April 21, 2020. See Group Two Scheduling Order (Dkt. 475). Thompson belongs to Group One and has been charged with one count of racketeering conspiracy in violation of 18 U.S.C. § 1962(d). See 2d Superseding Indictment at 2.

Following a jury trial in state court, Thompson was convicted of the murder of S.B., and of assault with the intent to commit murder of E.C. That case relates to count one in the second superseding indictment, and specifically to overt act 45. See id. at 17. The following factual background of the state case is taken from the Government's response brief, which Thompson did not refute in his reply:

> On August 20, 2015, at approximately 2:30 p.m., S.B. was standing on Elmdale Street in the City of Detroit talking to E.C. A black car, which was identified by five witnesses as a Pontiac Grand

---

[2] These five defendants include Mario Jackson, Michael Richardson, Corey Mills, Devontae Russell, and Phillip Peaks.

Prix drove past S.B. and E.C. and made a U-turn. As the Grand Prix drove back down Elmdale, the front-seat passenger fired a handgun. S.B. was shot in the back and killed. E.C. was shot ten times, but survived. Twenty-six 9 mm fired shell casings were recovered from the crime scene.

Three witnesses, who are all the same race as Thompson, testified that the driver of the Grand Prix was Thompson. Two of the witnesses were shown a photographic lineup the day after the shooting. The third witness identified Thompson after viewing a sequential photographic lineup 20 days after the crime.

Evidence at trial established that E.C. was the intended target. E.C. testified that prior to the shooting he noticed a black car behind him at a gas station and later following him as he was driving in the area of Elmdale Street. A cooperating witness who was housed with Thompson at the Wayne County Jail testified that Thompson confessed his involvement in the shooting. Thompson told the cooperating witness that this was a paid contract killing and that E.C. was the target. The cooperating witness testified that Thompson said he was hired by an individual named "Smoke" to kill E.C. According to Thompson, both "Smoke" and E.C. were charged together in a federal criminal case, and "Smoke" believed that E.C. was cooperating with law enforcement. Thompson described to the cooperating witness details about the shooting which included the location, the name of one of the witnesses, and the fact that Thompson drove a black Grand Prix during the shooting. Thompson also told the cooperating witness that the shooter was Lomnil Jackson and that Jackson shot a 9 mm handgun.

Additionally, during the trial, an expert testified about a forensic examination of a cell phone, which Thompson admitted belonged to him. The expert testified that less than nine minutes before the 911 call reporting the shooting, Thompson received a call on his cell phone. That call originated in a cell-phone sector that was different than the cell-phone sector which covers the area of the crime scene. When the call ended however, Thompson's cell phone had moved into the cell-phone sector that serviced the area of the crime scene. In short, the expert testified that Thompson's cell phone was traveling towards the location of the scene of the crime, just minutes before the shooting occurred. This evidence not only placed Thompson near the crime just minutes before the shooting, but it also established that Thompson was traveling, not stationary.

\* \* \*

>    Moreover, Thompson was arrested on September 10, 2015, approximately 20 days after the shooting, while driving a black Pontiac Grand Prix. While testifying at the state trial, Thompson admitted that in August 2015, he had access to and was driving a Pontiac Grand Prix. The police searched that Grand Prix and found an empty 9mm ammunition magazine with a 30-round capacity. That ammunition magazine was consistent with the caliber of firearm used in the shooting and its capacity is consistent with the number of fired shell casings recovered from the crime scene.

Govt' Resp. at PageID.3248-3251 (citations to exhibits omitted).

## II. STANDARD OF DECISION

The Compulsory Process Clause of the Sixth Amendment guarantees a criminal defendant the right to present a defense, including the right to offer the testimony of witnesses. Taylor v. Illinois, 484 U.S. 400, 408-409 (1988); Ferensic v. Birkett, 501 F.3d 469, 475 (6th Cir. 2007). A defendant's right to present a defense is not unlimited, however, and it may be subject to reasonable restrictions, including the Federal Rules of Evidence. United States v. Scheffer, 523 U.S. 303, 308 (1988); Taylor, 484 U.S. at 410 ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.").

Under Federal Rule of Evidence 702, a qualified expert may testify at trial if "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue . . . ." Fed. R. Evid. 702(a). The expert's testimony must be "based on sufficient facts or data" and "the product of reliable principles and methods." Fed. R. Evid. 702(b)-(c). The expert must also have "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(d).

Because expert testimony may form a critical part of a defendant's case, a district court's exclusion of testimony under Rule 702 may, "[i]n rare instances," violate the Sixth Amendment.

United States v. Vasilakos, 508 F.3d 401, 410 (6th Cir. 2007). Thus, to determine whether expert testimony is admissible, district courts are required to use the following two-part analysis:

> First, the court must determine whether the expert's testimony reflects "scientific knowledge," that is, the court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Second, the court must ensure that the proposed expert testimony is relevant to the task at hand and will serve to aid the trier of fact.

United States v. Smithers, 212 F.3d 306, 313 (6th Cir. 2000) (quoting Daubert v. Merrell Dow Pharm., 509 U.S. 579, 592-593 (1993)). To determine whether expert testimony will assist the jury under the second prong, the crucial inquiry is "'whether such testimony fell outside the juror's common knowledge and experience.'" United States v. Smead, 317 F. App'x 457, 465 (6th Cir. 2008) (quoting United States v. Rodriguez-Felix, 450 F.3d 1117, 1126 (10th Cir. 2006)).

Rule 702 places a special obligation on the trial court to be a gatekeeper, ensuring that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert, 509 U.S. at 589, 597. In Kumho Tire Company v. Carmichael, 526 U.S. 137, 141 (1999), the Supreme Court clarified that the "gatekeeping obligation" is not limited to "scientific" expert testimony, but it applies to all expert testimony. In other words, Rule 702 requires a district court to satisfy itself that the proposed expert testimony will assist the jury, before permitting the jury to assess such testimony. Id. at 148-149. The proponent of the expert must establish admissibility by a preponderance of the evidence. Nelson v. Tenn. Gas Pipeline Co., 243 F.3d 244, 251 (6th Cir. 2001). To comply with its obligation under Daubert, a district court is not required to hold an evidentiary hearing. Id. at 249. Instead, it is within the district court's discretion whether or not to hold a hearing. Id.

### III. DISCUSSION

Thompson claims that, during his trial in state court, the testimony of the two eyewitnesses regarding their identification of him as the driver of the Pontiac Grand Prix was unreliable because it was contradictory and internally inconsistent. Def. Mot. at 1-3; Def. Br. at 1-2. For instance, one eyewitness's physical description of Thompson supposedly did not match his actual appearance. Def. Br. at 1. The other eyewitness, a juvenile, was unsure at one point if Thompson was driving the vehicle and picked someone other than Thompson as the driver during a photographic array. Id. Because of this supposedly contradictory and inconsistent identification testimony, as well as the likelihood that the Government will rely on these witnesses during his federal trial, Thompson contends that expert testimony is needed to assist the jury in better understanding the reliability of eyewitness recollection. Def. Mot. at 2-3; Def. Br. at 5 ("There is no doubt that a scientific explanation and analysis of the vagaries of eyewitness testimony will be useful to the jury in analyzing the conflicting and often internally contradictory testimonies.").[3] This Court disagrees.

---

[3] In support of his motion, Thompson relies on Neil v. Biggers, 409 U.S. 188 (1972), and its progeny. See Def. Br. at 3, 5 (citing Biggers, Stovall v. Denno, 388 U.S. 293 (1967), and Mason v. Brathwaite, 432 U.S. 98 (1977)); see also Def. Reply at 6-7. However, all of these cases concerned whether certain police identification procedures were impermissibly suggestive and unnecessary to "give rise to a very substantial likelihood of irreparable misidentification." Biggers, 409 U.S. at 197; Mason, 432 U.S. at 101 ("This case presents the issue as to whether the Due Process Clause of the Fourteenth Amendment compels the exclusion, in a state criminal trial, apart from any consideration of reliability, of pretrial identification evidence obtained by a police procedure that was both suggestive and unnecessary."); Stovall, 388 U.S. at 301-302 (addressing "the question whether petitioner . . . is entitled to relief on his claim that in any event the confrontation conducted in this case was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law."); see also Perry v. New Hampshire, 565 U.S. 228, 238-239 (2012) ("[D]ue process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary."). Because Thompson is not challenging any purportedly suggestive and unnecessary identification procedure, the Court agrees with the Government that Thompson's reliance on these cases is misplaced.

The Sixth Circuit has recognized both the increasing use and reliability of expert testimony regarding eyewitness identification and its potential significance for criminal defendants. See, e.g., Ferensic, 501 F.3d at 481-483 (discussing the "near-universal acceptance of the reliability of expert testimony regarding eyewitness identification"); United States v. Bunke, 412 F. App'x 760, 768 (6th Cir. 2011) (citing Ferensic, 501 F.3d at 481-483); see also Thomas v. Heidle, 615 F. App'x 271, 281 (6th Cir. 2015) (when the government relies on eyewitness evidence, a criminal defendant has a "weighty" interest is having an eyewitness identification expert testify at trial).

Nevertheless, the Sixth Circuit's "favorable disposition" toward expert testimony on eyewitness identification does not mean that such expert testimony will be admitted in every case. Bunke, 412 F. App'x at 768. Rather, the admissibility of expert testimony will ultimately depend on the particular circumstances. For example, in United States v. Langan, the Sixth Circuit observed that "such testimony has been allowed in with increasing frequency where the circumstances include cross-racial identification, identification after a long delay, identification after observation under stress, and [such] psychological phenomena as . . . unconscious transference." 263 F.3d 613, 621 (6th Cir. 2001) (citation and quotation marks omitted).[4] And in Smithers, the Sixth Circuit indicated that "expert testimony should be admitted . . . when there is no other inculpatory evidence presented against the Defendant with the exception of a small number of eyewitness identifications." 212 F.3d at 317.[5] Conversely, factors that weigh against

---

[4] To the extent the Government is arguing that this portion of Langan set forth a four-factor test, see Gov't Br. at PageID 3247-3248, 3254, 3256, the Court agrees with Thompson that these are not factors insomuch as they are circumstances that may warrant expert testimony on eyewitness identification.

[5] This case does not involve any of the circumstances identified in Langan. Nor is this case one where the only inculpatory evidence is a small number of eyewitness identifications. As set forth in its response, the Government intends on using other evidence at trial, including cellphone-sector analysis of Thompson's and Defendant Lomnil Jackson's phones, an ammunition magazine

admissibility of expert testimony include "whether this type of testimony touched on the 'ultimate issue' in the case and therefore usurped the jury's role; whether there was other evidence against the defendant; and whether the jury could properly evaluate the reliability of eyewitness testimony through cross-examination." Id. at 314.

Here, Thompson argues that expert testimony regarding eyewitness identification is warranted because the prior testimony of two eyewitnesses' identifications of Thompson as the driver of the Pontiac Grand Prix is unreliable. The only basis Thompson offers for this unreliability is the supposed inconsistencies between and within the two identifications. Oddly enough, Thompson never actually offers a proposed expert in his motion. And aside from general platitudes about the unreliability of eyewitness testimony and a conclusory assertion that "a scientific explanation and analysis of the vagaries of eyewitness testimony will be useful to the jury in analyzing the conflicting and often internally contradictory testimonies," Def. Br. at 5, Thompson does not explain what an expert would likely testify about during trial.

Simply put, expert testimony regarding eyewitness identifications is supposed to "inform the jury of why the eyewitnesses' identifications were inherently unreliable" and, therefore, provide a "scientific, professional perspective that no one else [can] offer[] to the jury." Ferensic, 501 F.3d at 477 (emphasis in original). Without a proposed expert and proffered testimony, Thompson fails to demonstrate how and why expert testimony on eyewitness identification would provide jurors with a perspective that could come from no one else. Because Thompson does not offer any proposed expert testimony, let alone an expert, this Court is unable to assess the scientific

---

recovered from Thompson's car that is caliber-compatible with the handgun used to commit the murder of S.B. with a capacity of 30 rounds that is consistent with the physical evidence at the crime scene, and Thompson's purported confession to a cooperating witness. See Gov't Resp. at PageID.3254-3255.

8

validity of the reasoning or methodology underlying the testimony, or whether that reasoning or methodology properly can be applied to the facts in issues, as required by the first Daubert prong.

Based on Thompson's briefing, one could assume that the expert, whomever it might be, would apparently testify that inconsistent and contradictory identifications are unreliable. But as the briefing also demonstrates, counsel is sufficiently capable of highlighting any inconsistencies and contradictions in the eyewitnesses' anticipated testimony regarding their identifications of Thompson and argue the relative weight of such evidence. Thus, if the eyewitnesses' identifications are arguably unreliable simply because they are contradictory or inconsistent—as it has been presented and argued in the present motion—this is within the common and ordinary knowledge and experience of lay jurors. See Bunke, 412 F. App'x at 769 ("[I]t is within the ordinary knowledge of lay jurors that a fast-developing and confusing event is more likely to be perceived differently by observers than a simple, slow-occurring incident. This fact was underscored by the inconsistent testimonies of the [witnesses] at trial."). Thus, the Court concludes that, under the second prong of Daubert, Thompson has failed to demonstrate how expert testimony would assist the jury to better understand the evidence or determine a fact in issue; the jury could properly evaluate the reliability of eyewitness testimony through cross-examination.[6]

---

[6] Although Thompson claims that "[m]ere cross-examination, especially in the 'CSI' age, is not enough to adequately inform a jury regarding the live testimony of the witnesses to the case," Def. Br. at 2, Thompson does not address how any "CSI effect," which supposedly creates an unreasonable expectation in jurors' minds regarding the type of evidence needed to prove guilt in criminal cases, diminishes cross-examination of witnesses based on their supposed inconsistent or contradictory identifications. See United States v. Fields, 483 F.3d 313, 355 n.39 (5th Cir. 2007) ("The 'CSI effect' is a term that legal authorities and the mass media have coined to describe a supposed influence that watching the television show CSI: Crime Scene Investigation has on juror behavior. Some have claimed that jurors who see the high-quality forensic evidence presented on CSI raise their standards in real trials, in which actual evidence is typically more flawed and uncertain." (citation and quotation marks omitted)).

Therefore, the Court denies this portion of Thompson's motion for expert testimony on eyewitness identification.

Finally, Thompson believes that a <u>Daubert</u> evidentiary hearing should be conducted to determine the necessity of an expert. Def. Br. at 7. But with no proposed expert to qualify and no proffered testimony to assess for reliability and relevance, the Court fails to find the benefit in holding a hearing at this time. Therefore, the Court also denies Thompson's alternative request for a <u>Daubert</u> hearing.

### IV. CONCLUSION

For the reasons stated above, the Court denies Thompson's motion in limine to allow expert testimony on eyewitness identification or, in the alternative, conduct a <u>Daubert</u> evidentiary hearing (Dkt. 542).[7]

SO ORDERED.

Dated: February 12, 2019            s/Mark A. Goldsmith
       Detroit, Michigan           MARK A. GOLDSMITH
                                                    United States District Judge

---

[7] Although the Court denies the motion, this opinion should not be interpreted as excluding expert testimony, as there is neither an expert nor any proffered testimony to actually exclude.